# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **RANDELL L. KEYTE,** ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civil Action No. 1:04cv00114 |
| ) | **MEMORANDUM OPINION** |
| **JO ANNE B. BARNHART**, ) | |
| **Commissioner of Social Security,** ) | By: PAMELA MEADE SARGENT |
| Defendant ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

Plaintiff, Randell L. Keyte, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning

-1-

mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Keyte filed his application for DIB on or about July 26, 2002, alleging disability as of August 15, 2001, based on tinnitus, residuals of a gunshot wound to the right radius, degenerative changes in the left patella, lower back pain, headaches and hearing loss. (Record, ("R."), at 47-49, 53.) The claim was denied initially and upon reconsideration. (R. at 32-36, 37, 39-41.) Keyte then requested a hearing before an administrative law judge, ("ALJ"). (R. at 42.) The ALJ held a hearing on December 15, 2003, at which Keyte was represented.[1] (R. at 619-36.)

By decision dated January 21, 2004, the ALJ denied Keyte's claim. (R. at 16-24.) The ALJ found that Keyte met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 23.) The ALJ found that Keyte had not engaged in substantial gainful activity since August 15, 2001. (R. at 23.) The ALJ also found that the medical evidence established that Keyte suffered from severe impairments, namely arthritis of the left knee, status post arthroscopic surgery, and degenerative changes in the lumbar spine, but he found that Keyte did not have an impairment or combination of impairments listed at or medically equal to one

---

[1]Keyte was represented by Eric Reese, a paralegal with the law firm of Browning, Lamie & Gifford, P.C. (R. at 619.)

listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20, 23.) The ALJ found that Keyte's allegations were not totally credible. (R. at 23.) The ALJ found that Keyte retained the residual functional capacity to perform light work[2] diminished by mild restrictions resulting from an emotional disorder. (R. at 23.) Thus, the ALJ found that Keyte could not perform any of his past relevant work. (R. at 23.) Based on Keyte's age, education and work history and the testimony of a vocational expert, the ALJ concluded that Keyte could perform jobs existing in significant numbers in the national economy, including those of a cashier, a hand packager, an assembler, an inspector, an interviewer, an information clerk, a food prep worker, a waiter and a laborer. (R. at 23.) Thus, the ALJ found that Keyte was not disabled under the Act and was not eligible for DIB benefits. (R. at 23-24.) *See* 20 C.F.R. § 404.1520(g) (2005).

After the ALJ issued his decision, Keyte pursued his administrative appeals, (R. at 11-12), but the Appeals Council denied his request for review. (R. at 5-8.) Keyte then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2005). The case is before this court the Commissioner's motion for summary judgment filed April 21, 2005.

*II. Facts and Analysis[3]*

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2005).

[3]Because Keyte challenges only the ALJ's findings regarding his alleged mental impairment and his right arm impairment, I will discuss the medical evidence relevant only to

-3-

Keyte was born in 1959, (R. at 47, 622), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a high school education and past work experience as a corrections officer, a truck driver and a boiler technician in the United States Navy. (R. at 54, 59, 622-23.)

Keyte testified that he was unable to work because his left knee continuously gave way, he had difficulty walking and he experienced continuous back pain after falling from a roof and fracturing two discs. (R. at 623.) He stated that he had undergone knee surgery in February 2003, which did not help. (R. at 623-24.) He rated his knee pain as a seven on a 10-point scale, with 10 being the most severe pain. (R. at 625.) Keyte testified that he could obtain no relief from the pain and that walking only exacerbated it. (R. at 626.) He further testified that he experienced low back pain that radiated into his buttocks, but had undergone no back surgery. (R. at 624.) Keyte further stated that he had not undergone a recent myelogram or MRI. (R. at 624.) He described the pain as severe. (R. at 624.) When asked, Keyte stated that he suffered from some mild depression. (R. at 625.) However, he could not state that his depression alone would prevent him from working. (R. at 625.) Keyte stated that he was not seeing a mental health professional. (R. at 625.)

Keyte testified that he could walk only a short distance without interruption, and he estimated that he could stand for five to 15 minutes without interruption. (R. at 626, 629.) He stated that kneeling, crouching, crawling, squatting and bending also exacerbated his pain. (R. at 629.) Keyte testified that his pain affected his ability to concentrate, focus and stay on task. (R. at 630.) However, he opined that he could

these issues in this memorandum opinion.

-4-

perform a job that allowed for frequent postural changes. (R. at 626.) Keyte stated that he was able to drive to his father's house or a friend's house, a distance of approximately one-half mile, and he reported that he could "strip the bed" for his wife. (R. at 626.) Keyte testified that he enjoyed hunting and fishing in the past, but was no longer able to perform those activities. (R. at 627.) He stated that he watched television, read the newspaper and attended church services twice weekly. (R. at 627.)

Keyte testified that he was enlisted in the Navy for 17 ½ years before retiring. (R. at 627.) He stated that he had received a Veterans Administration disability rating of 40 percent based on his knee problems, hearing loss and residuals from a gunshot wound to the right dominant arm. (R. at 627-28.) Keyte noted that he could radiate his right wrist only to the right. (R. at 628.) He further stated that his ability to grip was affected. (R. at 628.) Keyte used a crutch-type cane during the hearing, on which he bore his weight with his right arm. (R. at 630.) He stated that he experienced weakness in his right arm depending on how he used it. (R. at 630.)

Cathy Sanders, a vocational expert, also was present and testified at Keyte's hearing. (R. at 631-36.) Sanders was asked to assume a hypothetical individual of Keyte's height, weight, education and work history, who could perform light and sedentary work,[4] but who had an emotional disorder that placed mild restrictions on his ability to perform work-related activities. (R. at 631-32.) Sanders testified that such an individual could perform the jobs of a cashier, a hand packager, an assembler,

---

[4]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. *See* 20 C.F.R. § 404.1567(a) (2005).

-5-

an inspector, an interviewer, an information clerk, miscellaneous food prep jobs, a waiter and a general and nonconstruction laborer, jobs that existed in significant numbers in the national economy. (R. at 632.) However, Sanders testified that, if Keyte's testimony regarding the degree of pain he experienced were considered credible, he would not be able to perform these jobs. (R. at 633.) Sanders further testified that a sit/stand option would reduce the number of jobs previously mentioned. (R. at 633-34.) Likewise, Sanders testified that the number of jobs previously mentioned would be decreased for an individual who had to use an assistive device to walk. (R. at 634.) Sanders testified that an individual who could not repetitively and productively use the dominant hand would have to be given additional job accommodations. (R. at 635.) Finally, Sanders testified that an individual who had to change positions as frequently as every five to 10 minutes would not be able to work. (R. at 636.)

In rendering his decision, the ALJ reviewed records from Branch Medical Center; Naval Regional Medical Center; University Hospital, Puerto Rico Medical Center; United States Naval Hospital; United States Air Force Medical Center, Scott Air Force Base; Dr. Michael Charles, M.D.; Veterans Administration Hospital; Department of Veterans Affairs; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Richard M. Surrusco, M.D., a state agency physician; and Robert S. Spangler, Ed.D., a licensed psychologist.

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the

Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2005).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated January 21, 2004, the ALJ denied Keyte's claim. (R. at 16-24.) The ALJ found that Keyte met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 23.) The ALJ found that Keyte had not engaged in substantial gainful activity since August 15, 2001. (R. at 23.) The ALJ also found that the medical evidence established that Keyte suffered from severe impairments, namely arthritis of the left knee, status post arthroscopic surgery, and degenerative changes in the lumbar spine, but he found that Keyte did not have an impairment or combination of impairments listed at or medically equal to one

listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20, 23.) The ALJ found that Keyte's allegations were not totally credible. (R. at 23.) The ALJ found that Keyte retained the residual functional capacity to perform light work diminished by mild restrictions resulting from an emotional disorder. (R. at 23.) Thus, the ALJ found that Keyte could not perform any of his past relevant work. (R. at 23.) Based on Keyte's age, education and work history and the testimony of a vocational expert, the ALJ concluded that Keyte could perform jobs existing in significant numbers in the national economy, including those of a cashier, a hand packager, an assembler, an inspector, an interviewer, an information clerk, a food prep worker, a waiter and a laborer. (R. at 23.) Thus, the ALJ found that Keyte was not disabled under the Act and was not eligible for DIB benefits. (R. at 23-24.) *See* 20 C.F.R. § 404.1520(g) (2005).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907

F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

Keyte argues that the ALJ erred by failing to find that he suffered from a severe mental impairment. (Brief In Support Of Plaintiff's Motion For Summary Judgment,[5] ("Plaintiff's Brief"), at 13-15.) Keyte also argues that the ALJ erred by failing to find that he suffered from a severe impairment concerning the use of his right dominant arm. (Plaintiff's Brief at 13, 15-16.)

Based on my review of the record, I reject Keyte's argument that the ALJ erred by failing to find that he suffered from a severe mental impairment. (Plaintiff's Brief 13-15.) The regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a) (2005). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. § 404.1521(b) (2005). The Fourth Circuit held in *Evans v. Heckler*, that

---

[5]Keyte has not filed a motion for summary judgment in this matter.

"'"[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."'" 734 F.2d 1012, 1014 (4th Cir. 1984)) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984) (citations omitted).

As the Commissioner notes in her brief, Keyte has never been diagnosed with a mental impairment and he has never received any mental health treatment. He testified at his hearing in December 2003 that he was not seeing a mental health professional. (R. at 625.) The only evidence contained in the record relating to Keyte's mental health is a consultative psychological evaluation performed by Robert S. Spangler, Ed.D., a licensed psychologist, on December 8, 2003, just one week prior to his hearing at the referral of his attorney. (R. at 608-13.) At that time, Spangler noted no speech or hearing difficulties, and he noted that Keyte demonstrated age-appropriate fine motor skills. (R. at 608.) He further noted that Keyte was awkward in his gross motor movements and used a crutch. (R. at 608.) Keyte's general activity level was deemed age- and task-appropriate and he appeared socially confident and comfortable. (R. at 608.) He generally understood instructions, but demonstrated erratic concentration. (R. at 608.) Although Keyte was appropriately persistent on tasks, Spangler noted that his pace was impacted by his need to change positions and to stand between tasks. (R. at 608.) Spangler noted no mental health allegations or treatment, and he further noted that Keyte was taking no prescription medications at that time. (R. at 609.)

Keyte was alert and fully oriented with adequate recall of remote and recent events. (R. at 609.) He was described as pleasant, forthcoming and fully compliant. (R. at 609.) Keyte manifested no loose associations or illogical language, and he appeared to be of average intelligence and emotionally stable. (R. at 609.) Delusional thought content was not evident, and there were no indications of malingering. (R. at 609.) Keyte stated that his wife performed the cooking, laundry and grocery shopping, but he stated that he occasionally made a sandwich. (R. at 610.) He stated that his granddaughter, who lived with him and his wife, helped with the household chores. (R. at 610.) Keyte reported that his nephew, wife and granddaughter performed the yardwork, although he stated that he occasionally mowed for 30 minutes using a riding mower. (R. at 610.) He stated that he napped one to two times daily for approximately 15 minutes each. (R. at 610.) Keyte reported watching television and attending church. (R. at 610.) He stated that he went to bed around midnight. (R. at 610.)

Spangler rated Keyte's social skills as adequate, and he noted that Keyte related well to him. (R. at 610.) Spangler opined that Keyte had the judgment necessary to handle his own financial affairs. (R. at 610.) The Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), test was administered, on which Keyte obtained a verbal IQ score of 93, a performance IQ score of 89 and a full-scale IQ score of 91. (R. at 610-12.) Spangler deemed the performance IQ score and the full-scale IQ score invalid as underestimates of Keyte's abilities due to his slow pace secondary to discomfort, shifting in his seat and being up and down between tasks. (R. at 610.) The verbal IQ score was deemed valid and reliable. (R. at 610.) Spangler opined that

Keyte was functioning in the average range of intelligence. (R. at 611.) The Wide Range Achievement Test-Third Edition, ("WRAT-3"), also was administered, the results of which placed Keyte at a high school reading level and a seventh-grade math level. (R. at 611.) Spangler diagnosed only nicotine dependence. (R. at 611.) He made no mental health diagnosis. (R. at 611.)

Spangler also completed a mental assessment, finding that Keyte had an unlimited or very good ability to understand, remember and carry out both simple and detailed job instructions. (R. at 614-15.) In all other areas of occupational and personal/social adjustment, Keyte was found to have good abilities. (R. at 614-15.) Spangler noted that Keyte had a slow overall pace that would impact his work-related activities. (R. at 616.)

Moreover, in a Daily Activities Questionnaire dated October 21, 2002, Keyte reported that he watched television, read the newspaper and helped his granddaughter with her homework. (R. at 74.) He further reported going outside of the home four to five times per week. (R. at 74.) He reported an ability to drive a car, and he stated that he grocery shopped, went to his father's house and attended weekly church services. (R. at 74, 77-78.) Keyte stated that he needed no assistance going places. (R. at 74.) He reported cooking twice monthly, and he stated that he performed household chores such as vacuuming and dusting on a weekly basis. (R. at 75.) Keyte stated that he performed various repairs and lawn work "when able." (R. at 75.) Keyte reported that he needed no assistance paying bills or dealing with bank accounts or insurance claims. (R. at 75.) He further reported hunting and fishing

approximately twice per year for a few hours.  (R. at 76.)  He stated that he read newspapers, books and magazines daily for 30 minutes to one hour. (R. at 76.) Keyte further reported watching news and movies on television and listening to music and talk radio programs for approximately five to six hours daily.  (R. at 76-77.)  Keyte reported visiting friends and relatives two to three times per week "when able."  (R. at 77.) He further reported talking with friends or relatives on the telephone and stated that he got along "ok" with others.  (R. at 77.)  Keyte reported that his wife and granddaughter were dependent on him for their care, noting that he had to take his wife to doctor appointments and to the grocery store because she did not drive.  (R. at 77.)  He stated that he and his wife did "pretty much everything" for their 10-year-old granddaughter.  (R. at 77.)  Keyte noted that his wife had to sometimes help him get out of the bathtub.  (R. at 79.)

Given the lack of mental health diagnoses and treatment, coupled with Spangler's very mild findings and Keyte's reported activities of daily living, I find that substantial evidence supports the ALJ's failure to find that Keyte suffers from a severe mental impairment.  I note that the ALJ specifically gave Keyte the benefit of the doubt by including a mild emotional disorder in his hypothetical to the vocational expert.  Nonetheless, the vocational expert found that jobs existed in significant numbers in the national economy that Keyte could perform.

Next, Keyte argues that the ALJ erred by failing to find that he suffered from a severe right dominant arm impairment. (Plaintiff's Brief at 13, 15-16.)  Based on my review of the record, I find that substantial evidence supports the ALJ's finding.

-13-

The evidence reveals that Keyte suffered a gunshot wound to the right forearm on May 16, 1982, while serving in the Navy. (R. at 223-29, 304.) Although the gunshot resulted in a broken right radius, there was no resulting muscle, nerve, tendon or vascular damage. (R. at 229, 239, 304, 529.) In February 2001, a physical examination performed by Dr. Michael Charles, M.D., revealed normal muscle tone in the extremities. (R. at 511.) Moreover, recent x-rays taken by the Veterans Administration on May 10, 2002, revealed a well-healed fracture of the middle portion of the radius. (R. at 531.) Likewise, in May 2002, Keyte was able to dress and undress without difficulty using both hands. (R. at 530.) No evidence of wasting or atrophy of the right forearm was noted. (R. at 531.) It was noted that Keyte was "able to easily make the OK sign with opposition of the thumb and the index finger of both hands and [had] excellent strength in doing this." (R. at 531.) Keyte had good dorsiflexion strength in both wrists, and his biceps, triceps and brachioradialis reflexes were intact bilaterally. (R. at 531.) There was no sensory loss over the hands, fingers or distal portions of the forearms. (R. at 531.) Keyte's wrists were described as architecturally normal with no edema, erythema or effusion. (R. at 531.) He exhibited an excellent range of motion with wrist dorsiflexion bilaterally to 70 degrees and palmar flexion to 80 degrees without pain or difficulty. (R. at 531.) He had ulnar deviation to 45 degrees and radial deviation to 20 degrees. (R. at 531.) An examination of the palmar surfaces of the hand revealed no wasting or atrophy of the interosseous musculature. (R. at 531.) Keyte could abduct and adduct the thumb and fingers of both hands with good strength, and he was able to oppose the thumb with the distal portions of each fingertip and fold all of the distal portions of each fingertip into the medial palmar fold bilaterally. (R. at 531.)

Moreover, the objective evidence of record does not support an allegation of grip difficulty. Instead, as previously mentioned, Keyte was able to make the "ok" sign, and he demonstrated excellent strength in doing so. (R. at 531.) During the May 2002 examination by the Veterans Administration, Keyte did not complain of right hand problems and he relayed no problems grasping, pushing, pulling, twisting, probing, writing or touching. (R. at 542.) It was concluded that Keyte required no treatment, support or other devices for his right hand. (R. at 542.) Thus, Keyte's allegations of grip difficulties are not substantiated by the medical evidence of record.

Next, as the Commissioner argues in her brief, Keyte's activities since suffering the gunshot wound in 1982 do not support his allegations of a severe impairment. For instance, Keyte participated in intramural football in the Navy the year after suffering his arm injury. (R. at 542.) Likewise, he was able to return to his job as a boiler technician in the Navy, a job which Keyte himself stated required very heavy lifting. (R. at 529.) Thereafter, Keyte worked for several years as a truck driver, a job obviously requiring use of the arms and hands. (R. at 54, 66, 91, 609, 622-23.) Finally, the Commissioner correctly notes in her brief that Keyte used a cane in his right hand at the time of his administrative hearing in December 2003. (R. at 630.)

Moreover, in May 2002, Keyte informed a physician at the Veterans Administration that the injury to his right arm did not interfere with his activities of daily living, including brushing his hair, shaving, bathing or eating. (R. at 529-30.) He further reported continuing to hunt, fish and garden, albeit in a somewhat modified

-15-

fashion due to difficulty with supination and pronation of the right forearm. (R. at 529.) Finally, even assuming that Keyte does experience limitations with regard to his right arm, he informed the examining physician that he tended to use his left hand more than his dominant right hand. (R. at 529.)

On May 8, 2003, Dr. Frank M. Johnson, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, finding that Keyte could perform medium work.[6] (R. at 599-606.) He found that Keyte could never climb ladders, ropes or scaffolds. (R. at 601.) Dr. Johnson found no manipulative, visual, communicative or environmental limitations. (R. at 602-03.) He found Keyte's subjective allegations only partially credible. (R. at 604.) Dr. Johnson's assessment was affirmed by Dr. Richard M. Surrusco, M.D., another state agency physician, on June 5, 2003. (R. at 606.)

I next note that although the Veterans Administration granted Keyte a 30 percent disability rating for his right forearm impairment, (R. at 550), that finding is of no consequence to this court's determination. As the Commissioner notes, opinions of an outside agency regarding disability are simply not binding upon the Commissioner. 20 C.F.R. § 404.1504 (2005); *Lee v. Sullivan*, 945 F.2d 687, 693 (4th Cir. 1991); *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

Finally, Keyte's activities of daily living, as outlined above, belie any

---

[6]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2005).

contention of a severe right arm impairment. As noted, Keyte participates in several ordinary activities of daily living, including caring for his 10-year-old granddaughter. (R. at 74-79.)

For all of these reasons, I find that substantial evidence supports the ALJ's failure to find that Keyte has a severe right forearm impairment.

## *III. Conclusion*

For the foregoing reasons, the Commissioner's motion for summary judgment will be granted and the Commissioner's decision to deny benefits will be affirmed.

An appropriate order will be entered.

DATED: This 16th day of August, 2005.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE